# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

RGN-USF, LLC, a Delaware limited liability )
company; and Pathway IP II GmbH, a Swiss )   Hon.
limited liability company, )   Magistrate Judge:
)
        Plaintiffs, )   Civil Action No.:
)
        v. )
)
Megatron Workspaces of Michigan, LLC, )   **COMPLAINT,**
a Michigan limited liability company; )   **INDEX OF EXHIBITS AND**
RGS Workspaces of Michigan LLC, )   **EXHIBITS A-O**
a Michigan limited liability company; )
RGS Workspaces of Michigan IV )
Southfield, LLC, )
a Michigan limited liability company; )
RGS Workspaces of Michigan III )
Shelby LLC, )
a Michigan limited liability company; )
RGS Workspaces of Michigan V )
Ann Arbor LLC, )
a Michigan limited liability company; and )
John B. Schmidt, an individual, )
)
        Defendants. )
)

Amy M. Johnston (P51272)
Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Ste. 2500
Detroit, MI 48226
(313) 963-6420
johnston@millercanfield.com

and

(*continued on next page*)

Keith D. Klein 184846
Robert A. Chereck 234693
(*Admission Requests Forthcoming*)
Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA  90401-2386
(310) 576-2159
keith.klein@bclplaw.com
andrew.chereck@bclplaw.com

Attorneys for Plaintiffs RGN-USF, LLC
and Pathway IP II GmbH

## COMPLAINT, INDEX OF EXHIBITS AND EXHIBITS A THROUGH O

## COMPLAINT

Plaintiffs RGN-USF, LLC and Pathway IP II GmbH for their Complaint hereby allege as follows:

## THE PARTIES

1.      Plaintiff RGN-USF, LLC ("RGN") is a Delaware limited liability company with its principal place of business at 3000 Kellway Drive, Suite 140, Carrollton, Texas 75006, with its sole member and direct parent Franchise International GmbH, a Swiss limited liability company with its principal business address at Dammstrasse 19, CH-6300 Zug, Switzerland, and whose sole member is International Work Places Group PLC, a St. Helier, Jersey private limited company listed on the London Stock Exchange with its principal place of business at Dammstrasse 19, CH-6300 Zug, Switzerland.   RGN is, therefore, a Swiss citizen.

2. Plaintiff Pathway IP II GmbH ("PIPS") is a limited liability company organized in Switzerland with its principal business address at Dammstrasse 19, CH-6300 Zug, Switzerland with its sole member and direct parent IWG International Holdings Sàrl, a limited liability company organized under the laws of Luxembourg with its principal business address at Boulevard Royal 26 2449, Luxembourg, and whose sole member is International Work Places Group PLC, a St. Helier, Jersey private limited company listed on the London Stock Exchange with its principal place of business at Dammstrasse 19, CH-6300 Zug, Switzerland. PIPS is, therefore, a Swiss citizen.

3. Plaintiffs RGN-USF, LLC and Pathway IP II GmbH are collectively referred to herein as "Plaintiffs."

4. Defendant John B. Schmidt ("Schmidt") is an individual and, on information and belief, is a citizen of Florida and resides in Miami, Florida.

5. Defendant Megatron Workspaces of Michigan, LLC ("Megatron") is a Michigan limited liability company with Schmidt as its sole member as reflected in Schmidt's representation in Schedule 10 of the Birmingham Franchise Agreement (defined below). Megatron, therefore, is a citizen of Florida.

6. Defendant RGS Workspaces of Michigan LLC ("Birmingham Franchisee") is a Michigan limited liability company with Schmidt as its sole member as reflected in Schmidt's representation in Schedule 10 of the

Birmingham Franchise Agreement (defined below). Birmingham Franchisee is, therefore, a citizen of Florida.

7.     Defendant RGS Workspaces of Michigan IV Southfield, LLC ("Southfield Franchisee") is a Michigan limited liability company with Schmidt as its sole member as reflected in Schmidt's representation in Schedule 10 of the Southfield Franchise Agreement (defined below).   Southfield Franchisee is, therefore, a citizen of Florida.

8.     Defendant RGS Workspaces of Michigan III Shelby LLC ("Clinton Township Franchisee") is a Michigan limited liability company with Schmidt as its sole member as reflected in Schmidt's representation in Schedule 10 of the Clinton Township Franchise Agreement (defined below).   Clinton Township Franchisee is, therefore, a citizen of Florida.

9.     Defendant RGS Workspaces of Michigan V Ann Arbor LLC ("Ann Arbor Franchisee") is a Michigan limited liability company with Schmidt as its sole member as reflected in Schmidt's representation in Schedule 10 of the Ann Arbor Franchise Agreement (defined below). Ann Arbor Franchisee is, therefore, a citizen of Florida.

10.   Defendants Megatron, Birmingham Franchisee, Southfield Franchisee, Clinton Township Franchisee, Ann Arbor Franchisee, and Schmidt are collectively referred to herein as "Defendants."

11.     Defendants Birmingham Franchisee, Southfield Franchisee, Clinton Township Franchisee, and Ann Arbor Franchisee are collectively referred to herein as the "Franchisee Defendants."

12.     Plaintiffs allege, on information and belief, that Megatron and the Franchisee Defendants are all affiliates of one another as they are under the common ownership and/or control of Schmidt.

## JURISDICTION AND VENUE

13.     The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000, and the plaintiff and all defendants are citizens of different states.

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

15.     Venue is proper in this district under 28 U.S.C. §1391(b) because the Defendants maintain their business in this district and a substantial part of the events giving rise to the claims asserted herein occurred in this district.

## GENERAL ALLEGATIONS

### Regus and the Regus® Marks

16.     Regus® is one of the largest flexible/virtual office, co-working facility, meeting and training facility, and commercial office alternative brands in

the world.

17.     Plaintiff PIPS is the registered owner of various trade names and service marks (which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (collectively, the "Regus Marks"), as well as the distinctive Regus® "System," which provides flexible, virtual and co-working office space to the public under the Regus® name and certain services to its franchisees, including a centralized booking system, advertising, publicity, and training services.

18.     PIPS or its predecessors have continuously used each of the Regus Marks since the date of their registration and these marks are in full force and effect pursuant to 15 U.S.C. § 1065.

19.     PIPS has given notice to the public of the registration of the Regus Marks as provided in 15 U.S.C. § 1111.

20.     PIPS, RGN and their affiliates use or have used the words "Regus," among others, as abbreviations of their brand name.

21.     Plaintiff RGN is PIPS' affiliate and has the exclusive right in the United States to sublicense the use of the Regus Marks and System through franchise agreements.

22.     A typical franchised Regus® office business occupies approximately 10,000 to 20,000 square feet of commercial office space but can be smaller or

larger depending on the site and the regional demographics of the area in which the business is located.

23.     Through Regus® offices, customers are provided the ability to run their businesses from the Regus® location without the overhead costs of leasing a fixed office space.

24.     The Regus® brand provides office space to 2.5 million people at over 4,000 offices, in over 120 countries, including 22 offices in the State of Michigan.

25.     Through the Regus® franchise system, RGN markets, promotes, and provides services to its franchisees throughout the United States.  To identify the origin of their flexible office space and related services, RGN, through its sublicense from PIPS, allows its franchisees to utilize the Regus Marks and to promote the Regus® brand name.

26.     Plaintiffs and their affiliates have invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in the Regus® brand and System to cause consumers throughout the United States to recognize the Regus Marks as distinctly designating office space as originating with Plaintiffs.

27.     The value of the goodwill developed in the Regus Marks is not readily quantifiable, but because Regus® is one of the largest office space systems in the United States and is widely known as a provider of flexible office space and

related services, the value of the Regus Marks exceeds millions of dollars.

**The Multi-Site Development Agreement Between RGN and Megatron**

28.     On or around January 15, 2021, RGN and Megatron entered into a Multi-Site Development Agreement for the development of Regus® offices within the Detroit designated marketing area or "DMA," which was subsequently amended on or about September 21, 2023 (as amended, the "Multi-Site Development Agreement"). A true and correct copy of the Multi-Site Development Agreement is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.

29.     Pursuant to Section 3.5 of the Multi-Site Development Agreement, Megatron agreed that it "will at all times faithfully, honestly and diligently perform [its] obligations and continuously exert your best efforts to promote and enhance the development of REGUS® Offices within the Development Area."

30.     Megatron further agreed to "(a) obtain locations and premises for REGUS® Offices within the Development Area approved by [RGN]; and (b) sign Franchise Agreements, along with the agreed-upon form of Addenda, to develop and open, and continue in operation, the number of REGUS® Offices within the time periods (the 'Development Periods') mandated by the schedule attached hereto as Exhibit 'C'[.]'"

31.     Pursuant to Exhibit C of the Multi-Site Development Agreement,

Megatron was obligated, in relevant part, to develop and open no fewer than four Regus® offices within the Detroit DMA by January 1, 2024 as follows: (i) one by December 31, 2021; (ii) one by December 31, 2022; (iii) one by December 31, 2023; and (iv) one REGUS® office by December 31, 2024 (the "Development Schedule").

32.    Pursuant to Section 3.6 of the Multi-Site Development Agreement, Megatron further agreed that "[s]trict compliance with the Development Schedule is of the essence." Megatron further agreed that "[i]f [Megatron] do[es] not timely meet the Development Schedule . . . , [Megatron] will be in default, subject to notice and a thirty (30) day cure period."

33.    Pursuant to Sections 3.5 and 7 of the Multi-Site Development Agreement, Megatron agreed that RGN may terminate the agreement for Megatron's failure to meet its Development Schedule upon Megatron's failure to cure within 30 days of RGN's notice.

**Megatron's Breach of the Multi-Site Development Agreement**

34.    Although Megatron was obligated to develop and open no fewer than four Regus® offices by January 1, 2024, Megatron operated only two *authorized* Regus® offices as of October of 2024.

**The Notice of Default and Termination of the Multi-Site Development Agreement**

35.    On October 4, 2024, RGN sent a notice of default to Megatron,

9

explaining that Megatron was in breach of the Multi-Site Development Agreement by failing to meet the Development Schedule. RGN further demanded that Megatron cure the default within 30 days of the notice. A true and correct copy of the notice of default to Megatron is attached hereto as <u>Exhibit B</u> and incorporated herein by reference.

36.   On November 13, 2024, RGN sent a notice of termination, notifying Megatron that the Multi-Site Development Agreement was deemed terminated due to its failure to cure the Development Schedule default. A true and correct copy of the notice of termination to Megatron is attached hereto as <u>Exhibit C</u> and incorporated herein by reference.

<b>The Parties' Franchise Agreements</b>

37.   On or about January 15, 2021, RGN and Birmingham Franchisee entered into a Franchise Agreement for the development and operation of a Regus® office located at 101 N. Old Woodward Ave., Birmingham, Michigan (the "Birmingham Franchise Agreement"). A true and correct copy of the Birmingham Franchise Agreement is attached hereto as <u>Exhibit D</u> and incorporated herein by reference.

38.   On or about September 21, 2023, RGN and Southfield Franchisee entered into a Franchise Agreement for the development and operation of a Regus® Office located at 29777 Telegraph Road, Southfield, Michigan 48034 (the

"Southfield Franchise Agreement"). A true and correct copy of the Southfield Franchise Agreement is attached hereto as <u>Exhibit E</u> and incorporated herein by reference.

39. On or about September 21, 2023, RGN and Clinton Township Franchisee entered into a Franchise Agreement for the development and operation of a Regus® Office located at 22600 Hall Road, Suite 100, Clinton Township, Michigan 48036-1172 (the "Clinton Township Franchise Agreement"). A true and correct copy of the Clinton Township Franchise Agreement is attached hereto as <u>Exhibit F</u> and incorporated herein by reference.

40. Concurrent with the execution of the Clinton Township Franchise Agreement, on or about September 21, 2023, RGN and Ann Arbor Franchisee entered into a Franchise Agreement for the development and operation of a Regus® Office located at 2006 Hogback Road, Suite 100, Ann Arbor, Michigan 48105 (the "Ann Arbor Franchise Agreement"). A true and correct copy of the Ann Arbor Franchise Agreement is attached hereto as <u>Exhibit G</u> and incorporated herein by reference.

41. The Birmingham Franchise Agreement, Southfield Franchise Agreement, Clinton Township Franchise Agreement and Ann Arbor Franchise Agreements are collectively referred to herein as the "Franchise Agreements." Except as otherwise alleged herein, the Franchise Agreements are the same in all

material respects and provide as follows.

42.     Pursuant to Section 3.1 of the Franchise Agreements, RGN granted Franchisee Defendants "the right to (a) operate a Regus® Office at the [p]remises, and at no other location; and (b) use the Marks, Know-How and the System in connection with operating [Franchisee Defendants'] Regus® Office."

43.     The term "Marks" is defined in the Franchise Agreements as "logos, designs, artwork and trade dress, trademarks, service marks, commercial symbols, and e-names, which have gained and continue to gain public acceptance and goodwill, and may create, use and license additional trademarks, service marks, e-names and commercial symbols in conjunction with the operation of Regus® Offices[.]"

44.     Section 3.1 of the Franchise Agreements provides that "the term of the Agreement begins on the Effective Date and expires ten (10) years from the Opening Date (i.e. the date [Franchisee] receives an Operating Certificate)."

45.     Pursuant to Section 6.3.5 of the Franchise Agreements, Franchisee Defendants agreed that "[b]efore opening a Regus® Office[,] an Operating Certificate must have been executed by both [RGN] and [Franchisee Defendant]."

46.     Pursuant to Section 9.1.12 of the Franchise Agreements, Franchisee Defendants agreed "to provide [RGN] with all financial and other information and reports specific to [the Franchisee's] REGUS® Office as specified in the System

12

Standards Manual and this Agreement."

47.    Pursuant to Section 9.1.4(a) of the Franchise Agreements, Franchisee Defendants agreed that during the terms of their agreements they would refrain from being "directly or indirectly engaged, concerned or interested in any business which produces, offers, sells, distributes or is otherwise involved in a Competitive Business[.]"

48.    Pursuant to Section 9.1.4(b) of the Franchise Agreements, the Franchisee Defendants likewise agreed to ensure that their guarantors, owners, and affiliates were not directly or indirectly engaged in, and did not have any direct or indirect interest in, any Competitive Business, unless otherwise agreed to by RGN.

49.    The Franchise Agreements define "Competitive Business" as "any business . . . which produces, offers, sells, distributes or is otherwise involved in, the sale of products or services the same or similar to, or which are competitive with, those services and/or products offered by us . . . which include, but are not limited to, any business offering office or workspace related products or services[.]"

50.    The Franchise Agreements define the term "Customer Fees" as all fees and sums that were charged to customers for their use of office space and other services provided by Regus® offices.

51.    Pursuant to Section 10.6.1 of the Franchise Agreements, all

"Customer Fees" were to be paid directly to RGN or its nominee.  Franchisee

Defendants thus agreed in Section 9.1.24 of the Franchise Agreements that "[i]f

[Franchisee Defendants] receive any Customer Fees directly from Customers or

other third parties, [Franchisee Defendants] shall immediately remit such sums in

full with no deduction or set-off to [RGN]," and further agreed pursuant to Section

9.1.24 to "use [RGN's] central invoicing system (currently 'Titan') to invoice

Customers," and pursuant to Section 10.6.3 to "enter into an electronic funds

transfer agreement with [their] bank in order to authorize [RGN] . . . to receive

payment of any monies payable to [it]."

52.    Section 16.1 of the Franchise Agreements set forth the Franchisee

Defendants' duties and obligations upon termination of the agreements, which

include, without limitation, immediately ceasing and discontinuing the operation

of their Regus® offices; and discontinuing the use of the Regus Marks.

53.    Pursuant to Section 16.2.1(a) of the Franchise Agreements,

Franchisee Defendants agreed that "[f]ollowing termination or expiration of [the

Franchise] Agreement [Franchisee Defendant] will not, and [] will ensure that [its]

Affiliates and [] Owners . . . will not, for a period of twenty-four (24) months

thereafter directly or indirectly . . . (a) engage in . . . directly or indirectly, any

business which is a Competitive Business in, or within fifty (50) miles of, [its]

Regus® Office, or within fifty (50) miles of the Regus® Office of another of

[RGN's] franchisees."

54.    Pursuant to Section 16.2.1(b), Franchisee Defendants agreed to refrain, for a period of 2 years following termination, from "us[ing] [its] former Regus® Office to engage in, be employed by or own an interest, directly or indirectly, in a business whose principal business activity is a Competitive Business."

55.    Schedule 7 of the Franchise Agreements sets forth the events for which RGN may terminate the agreements.

56.    These events are separated into: (i) "Substantial Breaches" for which the Franchisee Defendants would have either 60 days to cure for non-payment defaults or 7 days to cure for payment defaults; and (ii) "Termination Events" for which RGN could immediately terminate without providing Franchisee Defendants an opportunity to cure.

57.    The "Termination Events" include failing to cure a Substantial Beach within the provided cure period, engaging in unethical conduct (e.g., wrongfully collecting payments directly from customers and failing to report such payments to RGN), and violating the in-term non-competition covenants.

58.    Pursuant to Section 15.4.2, RGN may terminate any Franchise Agreement if RGN terminates "any other agreement" between RGN, on the one hand, and any of the Defendants, on the other hand, due to such other Defendant's

breach of the other agreement.

## Schmidt's Personal Guarantees and Non-Compete Agreements

59.     Concurrently with, and as consideration for, the execution of each of the Franchise Agreements, Schmidt executed both a personal guarantee and a non-compete agreement, which are attached as Schedules 6 and 11 to the Franchise Agreements, respectively. Schmidt's four personal guarantees are referred to collectively herein as the "Guarantees" and his four non-compete agreements are referred to collectively herein as the "Non-Compete Agreements."

60.     Pursuant to the Guarantees, Schmidt "absolutely and unconditionally guarantee[d] the payment of all amounts and the performance of all of the covenants, terms, conditions, agreements and undertakings contained and set forth in [the Franchise Agreements] and in any other agreement(s) by and between [RGN] and [Franchisee Defendants]."

61.     Schmidt further agreed "to be personally bound by each and every covenant, term, condition, agreement and undertaking contained and set forth in [the Franchise Agreements] and in any other agreement(s) by and between [RGN] and [Franchisee Defendants], and agree[d] that [the] Guarantee shall be construed as though [Schmidt] executed agreement(s) containing identical terms and conditions of the Franchise Agreement[s] and in any other agreement(s) between [RGN] and [Franchisee Defendants]."

62.     Pursuant to Section 1.3(a) the Non-Compete Agreements, Schmidt personally agreed that during the term of the Franchise Agreements and for twenty-four (24) months thereafter, he would not "engage in, be employed by or own an interest, directly or indirectly, in any business which is a Competitive Business in, or within fifty (50) miles of, [the Locations], or within fifty (50) miles of the Regus® Office of another of [RGN's] franchisees."

63.     Schmidt personally agreed that during the term of the Franchise Agreements and for twenty-four (24) months thereafter, he would not "engage in, be employed by or own an interest, directly or indirectly, in any business which is a Competitive Business in, or within fifty (50) miles of, [the Locations], or within fifty (50) miles of the Regus® Office of another of [RGN's] franchisees."

**The Franchisee Defendants' Breaches of the Franchise Agreements**

64.     Despite agreeing that all Customer Fees would be paid directly to RGN, Birmingham Franchisee, Clinton Township Franchisee and Ann Arbor Franchisee have engaged, and continue to engage, in the practice of collecting payments directly from customers without remitting such fees to RGN.

65.     To date, Birmingham Franchisee has failed to pay at least $51,827.00 in Customer Fees to RGN.  Further, Clinton Township Franchisee and Ann Arbor Franchisee have failed to pay any Customer Fees to RGN.

66.     As a result, Birmingham Franchisee, Clinton Township Franchisee,

and Ann Arbor breached Sections 9.1.12 and 10.6.1 of their respective Franchise Agreements.

67.     Clinton Township Franchisee and Ann Arbor Franchisee also opened their businesses under the Regus Marks in the first place without ever obtaining an Operating Certificate, without connecting to RGN's central invoicing system, and without executing an electronic funds transfer agreement authorizing RGN to receive payments.

68.     Clinton Township Franchisee and Ann Arbor Franchisee therefore breached their respective Franchise Agreements and, as a result of operating without an Operating Certificate, are engaged in the unauthorized opening and operation of competitive businesses purporting to be Regus® businesses. As a further consequence of these unauthorized operations, Birmingham Franchisee and Southfield Franchisee breached Section 9.1.4(b) of their Franchise Agreements by failing to ensure that their affiliates—Clinton Township Franchisee and Ann Arbor Franchisee—refrained from engaging in Competitive Businesses.

**Notices of Default and Termination**

69.     On account of the foregoing defaults, on October 4, 2024, RGN sent notices of default to each Franchisee Defendant under its respective Franchise Agreement.

70.     Specifically, in the notice of default to Birmingham Franchisee, RGN explained that Birmingham Franchisee breached the Birmingham Franchise Agreement by failing to remit all Customer Fees to RGN and underreporting sales, including at least $51,827.00 in Customer Fees, and through the unlawful operation of Competitive Businesses by its affiliates in violation of Section 9.1.4(b).

71.     RGN further demanded that Birmingham Franchisee cure such defaults within thirty days of receipt of the notice.  A true and correct copy of the notice of default to Birmingham Franchisee is attached hereto as Exhibit H and incorporated herein by reference.

72.     In the notice of default to Southfield Franchisee, RGN explained that Southfield Franchisee breached the Southfield Franchise Agreement by failing to ensure that its affiliates refrain from engaging in Competitive Businesses and demanded the default be cured within 30 days of the notice.  A true and correct copy of the notice of default to Southfield Franchisee is attached hereto as Exhibit I and incorporated herein by reference.

73.     In the notices to Clinton Township Franchisee and Ann Arbor Franchisee, RGN explained that Clinton Township Franchisee breached the Clinton Township Franchise Agreement and Ann Arbor Franchisee breached the Ann Arbor Franchise Agreement by failing to obtain an Operating Certificate

prior to commencing operations under the Regus Marks, failing to connect to RGN's central invoicing system, failing to execute an electronic funds transfer agreement authorizing RGN to receive payments, and engaging in the unauthorized operation of a Competitive Business.

74.    RGN demanded that Clinton Township Franchisee and Ann Arbor Franchisee cure the default for the failure to obtain an Operating Certificate within sixty days of receipt of the notice and cure the remaining defaults within thirty days of the notice.

75.    A true and correct copy of the notice of default to Clinton Township Franchisee is attached hereto as Exhibit J and incorporated herein by reference.  A true and correct copy of the notice of default to Ann Arbor Franchisee is attached hereto as Exhibit K and incorporated herein by reference.

76.    Franchisee Defendants failed to cure any of the noticed defaults within the requisite cure periods and have not done so as of the date of this Complaint.

77.    On November 13, 2024, RGN informed Franchisee Defendants that their Franchise Agreements were terminated and advised them that, notwithstanding such terminations, Franchisee Defendants remained fully liable for any and all of the obligations that survive termination, including without limitation, their post-termination non-competition obligations in Section 16. A

true and correct copy of the notice of termination to Birmingham Franchisee is attached hereto as <u>Exhibit L</u> and incorporated herein by reference, a true and correct copy of the notice of termination to Southfield Franchisee is attached hereto as <u>Exhibit M</u> and incorporated herein by reference, a true and correct copy of the notice of termination to Clinton Township Franchisee is attached hereto as <u>Exhibit N</u> and incorporated herein by reference, and a true and correct copy of the notice of termination to Ann Arbor Franchisee is attached hereto as <u>Exhibit O</u> and incorporated herein by reference.

78.    The termination of the Franchise Agreement precludes the Franchise Defendants from any further use of the Regus Marks in or around their businesses; however, the Franchise Defendants continue to use the Regus Marks to induce customers to rent office space and procure related services and continue to operate each of the office locations as a Regus® brand business.

## <u>COUNT I</u>

## <u>TRADEMARK INFRINGEMENT</u>

### (Against Trademark Infringement)

79.    Plaintiffs incorporate and re-allege each and every one of the allegations set forth in paragraphs 1 through 78 above as though fully set forth herein.

80.    Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in

pertinent part that:

> "[a]ny person who shall, without the consent of the
> registrant — use in commerce any reproduction,
> counterfeit, copy, or colorable imitation of a registered
> mark in connection with the sale, offering for sale,
> distribution, or advertising of any goods or services on
> or in connection with which such use is likely to cause
> confusion, or to cause mistake, or to deceive . . . shall be
> liable in a civil action by the registrant . . . ."

81.    Franchisee Defendants marketed, promoted, and rented, and continue to market, promote, and rent office space and related services from their businesses through the unauthorized use of the Regus Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

82.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that:

> "[a]ny person who, on or in connection with any goods
> or services . . . uses in commerce any word, term, name,
> symbol . . . or any false designation of origin, false or
> misleading description of fact, or false or misleading

representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods [or] services . . . shall be liable in a civil action . . . ."

83.     The acts of the Franchisee Defendants marketing, promoting, their businesses and collecting Customer Fees therefrom, through and with the Regus Marks, constitute: (a) a false designation of origin; (b) a false and misleading description of fact; and (c) a false and misleading representation of fact; that caused and are likely to continue to cause confusion, or to cause mistake, or deception, as to the affiliation of the Franchisee Defendants' businesses with Regus®, and to cause confusion, or to cause mistake, or deception, to the effect that Plaintiffs sponsor or approve of the services and products that the Franchisee Defendants are providing to customers, all in violation of Section 43(a) of the Lanham Act.

84.     The Franchisee Defendants' on-going acts of infringement in violation of Sections 32 and 43(a) of the Lanham Act are malicious, fraudulent, willful, and deliberate.

85.     The Franchisee Defendants' on-going acts of infringement in violation of Sections 32 and 43(a) of the Lanham Act have inflicted and continue

to inflict irreparable harm on Plaintiffs.

86. No previous injunctive relief has been awarded with respect to this matter in this case or any other cases.

87. As a direct and proximate cause of all of the conduct described above, Plaintiffs have been damaged in an amount not presently ascertained, but which exceeds $75,000. PIPS is entitled to treble damages, punitive damages, and disgorgement of the Franchisee Defendants' profits from their willful and intentional violation of PIPS' rights.

88. Further, PIPS has no adequate remedy at law. The conduct of the Franchisee Defendants has caused, and if not enjoined, will continue to cause, irreparable harm and damage to the rights of PIPS and the Regus Marks and to the business, reputation and goodwill of PIPS, RGN, and RGN's franchisees.

89. By reason of the foregoing, PIPS is entitled to preliminary and permanent injunctive relief against the Patels, restraining further acts of trademark infringement.

## COUNT II

## BREACH OF CONTRACT (MULTI-SITE DEVELOPMENT AGREEMENT)

(Against Megatron Workspaces of Michigan, LLC)

90. Plaintiffs incorporate and re-allege each and every one of the allegations set forth in paragraphs 1 through 89 above as though fully set forth

herein.

91.     The Multi-Site Development Agreement was a valid and binding contract between RGN and Megatron.

92.     RGN performed all obligations required to be performed under the Multi-Site Development Agreement, except to the extent prevented from doing so by Defendants or otherwise excused.

93.     Pursuant to Section 3.5 of the Multi-Site Development Agreement, Megatron agreed that it "will at all times faithfully, honestly and diligently perform [its] obligations and continuously exert your best efforts to promote and enhance the development of REGUS® Offices within the Development Area." Megatron further agreed to "(a) obtain locations and premises for REGUS® Offices within the Development Area approved by [RGN]; and (b) sign Franchise Agreements, along with the agreed-upon form of Addenda, to develop and open, and continue in operation, the number of REGUS® Offices within the time periods . . . mandated by the schedule attached hereto as Exhibit 'C'[.]"

94.     Pursuant to Exhibit C of the Multi-Site Development Agreement, Megatron was obligated, in relevant part, to develop Regus® offices within the Detroit DMA as follows: (i) one by December 31, 2021; (ii) one by December 31, 2022; (iii) one by December 31, 2023; and (iv) one by December 31, 2024.

95.     Pursuant to Section 3.6, Megatron agreed that "[s]trict compliance

with the Development Schedule is of the essence."

96.     Megatron further agreed that "[i]f [it] do[es] not timely meet the Development Schedule . . . , [it] will be in default, subject to notice and a thirty (30) day cure period."

97.     Megatron materially breached the Multi-Site Development Agreement by failing to develop and open no fewer than four REGUS® Offices by January 1, 2024.

98.     On October 4, 2024, RGN sent Megatron a notice of default and demand to cure its default within thirty (30) days of receipt of the notice. However, Megatron failed to cure the default within 30 days of the receipt of the notice.

99.     As of the date of filing this Complaint, Megatron has failed to cure its default.

100.    As a direct and proximate cause of Megatron's material breach of the Multi-Site Development Agreement, RGN has been damaged in an amount not presently ascertained, but which exceeds $75,000.

## COUNT III

## BREACH OF CONTRACT (BIRMINGHAM FRANCHISE AGREEMENT)

### (Against RGS Workspaces of Michigan LLC)

101.    Plaintiffs incorporate and re-allege each and every one of the

allegations set forth in paragraphs 1 through 100 above as though fully set forth herein.

102.  The Birmingham Franchise Agreement was a valid and binding contract between RGN and Birmingham Franchisee.

103.  RGN performed all obligations required to be performed under the Birmingham Franchise Agreement, except to the extent prevented from doing so by Defendants or otherwise excused.

104.  Pursuant to Section 9.1.12 of the Birmingham Franchise Agreement, Birmingham Franchisee was obligated "to provide [RGN] with all financial and other information and reports specific to [Birmingham Franchisee's] REGUS® Office as specified in the System Standards Manual and this Agreement."

105.  Pursuant to Section 10.6.1 of the Birmingham Franchise Agreement, Birmingham Franchisee further agreed that "[a]ll Customer Fees are to be paid directly to [RGN]" and "[i]f [Birmingham Franchisee] receive[s] any Customer Fees directly from Customers or other third parties [Birmingham Franchisee] shall immediately remit such sums in full with no deduction or set-off to [RGN]."

106.  Pursuant to Section 2(i) of Schedule 7 of the Birmingham Franchise Agreement, RGN could immediately terminate the Birmingham Franchise Agreement if Birmingham Franchisee engaged in "any dishonest or unethical conduct which may adversely affect the reputation of [the] Regus® Office or

27

another Regus® Office or the goodwill associated with the Marks[.]"

107. Pursuant to Section 9.1.4(b) of the Birmingham Franchise Agreement, Birmingham Franchisee agreed "to ensure that none of [its] Affiliates or [its] Owners are directly or indirectly engaged, concerned or interested in a Competitive Business, and to ensure that each of [Franchisee's] Owners sign an individual undertaking of non-competition[.]"

108. Pursuant to Section 16.1 of the Birmingham Franchise Agreement, upon termination of the agreement, Birmingham Franchisee was to immediately cease and discontinue the operation of its Regus® office and discontinue the use of the Regus Marks.

109. Pursuant to Section 16.2.1(a) of the Birmingham Franchise Agreement, Birmingham Franchisee agreed that "[f]ollowing termination or expiration of [the Franchise] Agreement [Birmingham Franchisee] will not, and [] will ensure that [its] Affiliates and [] Owners . . . will not, for a period of twenty-four (24) months thereafter directly or indirectly . . . (a) engage in . . . directly or indirectly, any business which is a Competitive Business in, or within fifty (50) miles of, [its] Regus® Office, or within fifty (50) miles of the Regus® Office of another of [RGN's] franchisees."

110. Pursuant to Section 16.2.1(b), Birmingham Franchisee agreed to refrain, for a period of 2 years following termination of the Birmingham Franchise

Agreement, from "us[ing] [its] former Regus® Office to engage in, be employed by or own an interest, directly or indirectly, in a business whose principal business activity is a Competitive Business."

111.   Birmingham Franchisee materially breached the Birmingham Franchise Agreement by, without limitation, failing to report all Customer Fees and sales to RGN; failing to pay at least $51,827.00 in Customer Fees; and failing to ensure that its affiliates refrain from engaging in Competitive Businesses.

112.   Birmingham Franchisee failed to cure its breaches of the Birmingham Franchise Agreement within the requisite cure periods and, as a result, the Birmingham Franchise Agreement was terminated on November 13, 2024.

113.   Nevertheless, Birmingham Franchisee continues to operate its business as a Regus® office under the Regus Marks in further breach of Section 16 of the Birmingham Franchise Agreement.

114.   As a direct and proximate cause of Birmingham Franchisee's material breaches of the Birmingham Franchise Agreement, RGN has been damaged in an amount not presently ascertained, but which exceeds $75,000.

## COUNT IV

## BREACH OF CONTRACT (SOUTHFIELD FRANCHISE AGREEMENT)

### (Against RGS Workspaces of Michigan IV Southfield, LLC)

115.   Plaintiffs incorporate and re-allege each and every one of the

allegations set forth in paragraphs 1 through 114 above as though fully set forth herein.

116.   The Southfield Franchise Agreement was a valid and binding contract between RGN and Southfield Franchisee.

117.   RGN performed all obligations required to be performed under the Southfield Franchise Agreement, except to the extent prevented from doing so by Defendants or otherwise excused.

118.   Pursuant to Section 9.1.4(b) of the Southfield Franchise Agreement, Southfield Franchisee agreed "to ensure that none of [its] Affiliates or [its] Owners are directly or indirectly engaged, concerned or interested in a Competitive Business, and to ensure that each of [Franchisee's] Owners sign an individual undertaking of non-competition."

119.   Pursuant to Section 2(r) of Schedule 7 of the Southfield Franchise Agreement, the unlawful operation of Competitive Businesses by the Southfield Franchisee's affiliates entitled RGN to immediately terminate the Southfield Franchise Agreement.

120.   Pursuant to Section 16.1 of the Southfield Franchise Agreement, upon termination of the agreement, Southfield Franchisee was to immediately cease and discontinue the operation of its Regus® office and discontinue the use of the Regus Marks.

121.   Pursuant to Section 16.2.1(a) of the Southfield Franchise Agreement, Southfield Franchisee agreed that "[f]ollowing termination or expiration of [the Franchise] Agreement [Southfield Franchisee] will not, and [] will ensure that [its] Affiliates and [] Owners . . . will not, for a period of twenty-four (24) months thereafter directly or indirectly . . . (a) engage in . . . directly or indirectly, any business which is a Competitive Business in, or within fifty (50) miles of, [its] Regus® Office, or within fifty (50) miles of the Regus® Office of another of [RGN's] franchisees."

122.   Pursuant to Section 16.2.1(b), Southfield Franchisee agreed to refrain, for a period of 2 years following termination of the Southfield Franchise Agreement, from "us[ing] [its] former Regus® Office to engage in, be employed by or own an interest, directly or indirectly, in a business whose principal business activity is a Competitive Business."

123.   Southfield Franchisee materially breached the Southfield Franchise Agreement by, without limitation, failing to ensure that its affiliates refrain from engaging in Competitive Businesses.

124.   Southfield Franchisee failed to cure its breaches of the Southfield Franchise Agreement within the requisite cure period and, as a result, the Southfield Franchise Agreement was terminated on November 13, 2024.

125.   Nevertheless, Southfield Franchisee continues to operate its business

as a Regus® office under the Regus Marks in further breach of Section 16 of the Southfield Franchise Agreement.

126. As a direct and proximate cause of Southfield Franchisee's material breaches of the Southfield Franchise Agreement, RGN has been damaged in an amount not presently ascertained, but which exceeds $75,000.

## COUNT V

## BREACH OF CONTRACT (CLINTON TOWNSHIP FRANCHISE AGREEMENT)

### (Against RGS Workspaces of Michigan III Shelby LLC)

127. Plaintiffs incorporate and re-allege each and every one of the allegations set forth in paragraphs 1 through 126 above as though fully set forth herein.

128. The Clinton Township Franchise Agreement was a valid and binding contract between RGN and Clinton Township Franchisee.

129. RGN performed all obligations required to be performed under the Clinton Township Franchise Agreement, except to the extent prevented from doing so by Defendants or otherwise excused.

130. Pursuant to Pursuant to Section 10.6.1 of the Clinton Township Franchise Agreement, Clinton Township Franchisee agreed that "[a]ll Customer Fees are to be paid directly to [RGN]" and "[i]f [Franchisee] receive[s] any Customer Fees directly from Customers or other third parties [Franchisee] shall

immediately remit such sums in full with no deduction or set-off to [RGN]."

131.   Pursuant to Section 9.1.12, Clinton Township Franchisee further "agree[d] at all times during the Term . . . to provide [RGN] with all financial and other information and reports specific to [Franchisee's] Regus® Office as specified in the System Standards Manual and this Agreement[.]"

132.   Pursuant to Section 9.1.24, Clinton Township Franchisee agreed to "use [RGN's] central invoicing system (currently 'Titan') to invoice Customers."

133.   Pursuant to Section 10.6.3, Clinton Township Franchisee was required to "enter into an electronic funds transfer agreement with [its] bank in order to authorize [RGN] . . . to receive payment of any monies payable to [RGN.]"

134.   Pursuant to Section 9.1.4(b), Clinton Township Franchisee agreed "to ensure that none of [its] Affiliates or [its] Owners are directly or indirectly engaged, concerned or interested in a Competitive Business, and to ensure that each of [Franchisee's] Owners sign an individual undertaking of non-competition."

135.   Pursuant to Section 16.1 of the Clinton Township Franchise Agreement, upon termination of the agreement, Clinton Township Franchisee was to immediately cease and discontinue the operation of its Regus® office and discontinue the use of the Regus Marks.

136.   Pursuant to Section 16.2.1(a) of the Clinton Township Franchise Agreement, Clinton Township Franchisee agreed that "[f]ollowing termination or expiration of [the Franchise] Agreement [Clinton Township Franchisee] will not, and [] will ensure that [its] Affiliates and [] Owners . . . will not, for a period of twenty-four (24) months thereafter directly or indirectly . . . (a) engage in . . . directly or indirectly, any business which is a Competitive Business in, or within fifty (50) miles of, [its] Regus® Office, or within fifty (50) miles of the Regus® Office of another of [RGN's] franchisees."

137.   Pursuant to Section 16.2.1(b), Clinton Township Franchisee agreed to refrain, for a period of 2 years following termination of the Clinton Township Franchise Agreement, from "us[ing] [its] former Regus® Office to engage in, be employed by or own an interest, directly or indirectly, in a business whose principal business activity is a Competitive Business."

138.   Clinton Township Franchisee materially breached the Clinton Township Franchise Agreement by, without limitation: failing to obtain an Operating Certificate, failing to connect to RGN's central invoicing system, failing to execute an electronic funds transfer agreement authorizing RGN to receive payments, failing to remit all Customer Fees to RGN, failing to provide RGN with "all financial and other information," and failing to ensure that its affiliates refrain from engaging in Competitive Businesses.

139.   Clinton Township Franchisee failed to cure its breaches of the Clinton Township Franchise Agreement within the requisite cure periods and, as a result, the Clinton Township Franchise Agreement was terminated on November 13, 2024.

140.   Nevertheless, Clinton Township Franchisee continues to operate its business as a Regus® office under the Regus Marks in further breach of Section 16 of the Clinton Township Franchise Agreement.

141.   As a direct and proximate cause of Clinton Township Franchisee's material breaches of the Clinton Township Franchise Agreement, RGN has been damaged in an amount not presently ascertained, but which exceeds $75,000.

## COUNT VI

## BREACH OF CONTRACT (ANN ARBOR FRANCHISE AGREEMENT)

### (Against RGS Workspaces of Michigan V Ann Arbor LLC)

142.   Plaintiffs incorporate and re-allege each and every one of the allegations set forth in paragraphs 1 through 141 above as though fully set forth herein.

143.   The Ann Arbor Franchise Agreement was a valid and binding contract between RGN and Ann Arbor Franchisee.

144.   RGN performed all obligations required to be performed under the Ann Arbor Franchise Agreement, except to the extent prevented from doing so by

Defendants or otherwise excused.

145.   Pursuant to Pursuant to Section 10.6.1 of the Ann Arbor Franchise Agreement, Clinton Township Franchisee agreed that "[a]ll Customer Fees are to be paid directly to [RGN]" and "[i]f [Franchisee] receive[s] any Customer Fees directly from Customers or other third parties [Franchisee] shall immediately remit such sums in full with no deduction or set-off to [RGN]."

146.   Pursuant to Section 9.1.12, Ann Arbor Franchisee further "agree[d] at all times during the Term . . . . to provide [RGN] with all financial and other information and reports specific to [Franchisee's] Regus® Office as specified in the System Standards Manual and this Agreement[.]"

147.   Pursuant to Section 9.1.24, Ann Arbor Franchisee agreed to "use [RGN's] central invoicing system (currently 'Titan') to invoice Customers."

148.   Pursuant to Section 10.6.3, Ann Arbor Franchisee was required to "enter into an electronic funds transfer agreement with [its] bank in order to authorize [RGN] . . . to receive payment of any monies payable to [RGN.]"

149.   Pursuant to Section 9.1.4(b), Ann Arbor Franchisee agreed "to ensure that none of [its] Affiliates or [its] Owners are directly or indirectly engaged, concerned or interested in a Competitive Business, and to ensure that each of [Franchisee's] Owners sign an individual undertaking of non-competition."

150.   Pursuant to Section 16.1 of the Ann Arbor ip Franchise Agreement,

36

upon termination of the agreement, Ann Arbor Franchisee was to immediately cease and discontinue the operation of its Regus® office, and discontinue the use of the Regus Marks.

151.   Pursuant to Section 16.2.1(a) of the Ann Arbor Franchise Agreement, Clinton Township Franchisee agreed that "[f]ollowing termination or expiration of [the Franchise] Agreement [Ann Arbor Franchisee] will not, and [] will ensure that [its] Affiliates and [] Owners . . . will not, for a period of twenty-four (24) months thereafter directly or indirectly . . . (a) engage in . . . directly or indirectly, any business which is a Competitive Business in, or within fifty (50) miles of, [its] Regus® Office, or within fifty (50) miles of the Regus® Office of another of [RGN's] franchisees."

152.   Pursuant to Section 16.2.1(b), Ann Arbor Franchisee agreed to refrain, for a period of 2 years following termination of the Ann Arbor Franchise Agreement, from "us[ing] [its] former Regus® Office to engage in, be employed by or own an interest, directly or indirectly, in a business whose principal business activity is a Competitive Business."

153.   Ann Arbor Franchisee materially breached the Ann Arbor Franchise Agreement by, without limitation: failing to obtain an Operating Certificate, failing to connect to RGN's central invoicing system, failing to execute an electronic funds transfer agreement authorizing RGN to receive payments, failing

to remit all Customer Fees to RGN, failing to provide RGN with "all financial and other information," and failing to ensure that its affiliates refrain from engaging in Competitive Businesses.

154. Ann Arbor Franchisee failed to cure its breaches of the Ann Arbor Franchise Agreement within the requisite cure periods and, as a result, the Ann Arbor Franchise Agreement was terminated on November 13, 2024.

155. Nevertheless, Ann Arbor Franchisee continues to operate its business as a Regus® office under the Regus Marks in further breach of Section 16 of the Ann Arbor Franchise Agreement.

156. As a direct and proximate cause of Ann Arbor Franchisee's material breaches of the Ann Arbor Franchise Agreement, RGN has been damaged in an amount not presently ascertained, but which exceeds $75,000.

## COUNT VII

## BREACH OF CONTRACT (GUARANTEES)

### (Against John B. Schmidt)

157. Plaintiffs incorporate and re-allege each and every one of the allegations set forth in paragraphs 1 through 156 above as though fully set forth herein.

158. Pursuant to the terms of the Guarantees, Schmidt, among other things, absolutely and unconditionally guaranteed the performance of all payment

and other obligations of the Franchisee Defendants under the Franchise Agreements.

159.   Schmidt further agreed to be personally bound by each provision of the Franchise Agreements as though Schmidt had personally signed the Franchise Agreements as the franchisee.

160.   RGN performed all obligations required to be performed under the Guarantees, except to the extent prevented from doing so by Schmidt or otherwise excused.

161.   Schmidt breached the Guarantees by failing to ensure performance of all obligations of the Franchisee Defendants, including their post-termination obligations; failing to ensure payment of all amounts owed to RGN, including Customer Fees; and by failing to pay all such amounts owed to RGN on behalf of the Franchisee Defendants.

162.   As a direct and proximate result of the foregoing breaches of the Guarantees by Schmidt, Plaintiffs have been, and continue to be, damaged in an amount not presently ascertained, but which exceeds $75,000.

## COUNT VIII

## BREACH OF CONTRACT (NON-COMPETE AGREEMENTS)

### (Against John B. Schmidt)

163.   Plaintiffs incorporate and re-allege each and every one of the

allegations set forth in paragraphs 1 through 162 above as though fully set forth herein.

164.   Pursuant to the terms of the Non-Compete Agreements, Schmidt personally agreed that during the term of the Franchise Agreements and for twenty-four (24) months thereafter, he would not "engage in, be employed by or own an interest, directly or indirectly, in any business which is a Competitive Business in, or within fifty (50) miles of, [the Locations], or within fifty (50) miles of the Regus® Office of another of [RGN's] franchisees."

165.   RGN performed all obligations required to be performed under the Non-Compete Agreements, except to the extent prevented from doing so by Schmidt or otherwise excused.

166.   Schmidt breached the Non-Compete Agreements by, without limitation: (i) owning an interest in Clinton Township Franchisee and Ann Arbor Franchisee, each of which operated prior to the termination of the Franchise Agreements and continues to operate post-termination of their respective Franchise Agreements a Competitive Business in the form of a business purporting to be a Regus® business without authorization from RGN; and (ii) owing an interest in Birmingham Franchisee and Southfield Franchisee, each of which continues to operate under the Regus® brand notwithstanding the termination of their respective Franchise Agreements.

167.   As a direct and proximate result of the foregoing breaches of the Non-Compete Agreements by Schmidt, Plaintiffs have been, and continue to be, damaged in an amount not presently ascertained, but which exceeds $75,000.

## COUNT IX

## UNJUST ENRICHMENT

### (Against Defendants)

168.   Plaintiffs incorporate and re-allege each and every one of the allegations set forth in paragraphs 1 through 167 above as though fully set forth herein.

169.   At the time of the termination of the Franchise Agreements, Franchisee Defendants and Schmidt (pursuant to his Guarantees) were obligated to pay all Customer Fees to RGN.

170.   Despite their obligation to do so, Franchisee Defendants and Schmidt failed to pay certain of the Customer Fees due and owing under the Franchise Agreements in an amount to be determined at trial, but which are equal to at least $51,827.

171.   In addition, Defendants benefited from their wrongful use of the Regus Marks after termination of the Franchise Agreements without adequate compensation to Plaintiffs for that benefit.

172.   Defendants' failure to adequately compensate Plaintiffs constitutes

unjust enrichment and has damaged Plaintiffs.

173. As a direct and proximate cause of all of the material breaches described above, Plaintiffs have been damaged in an amount not presently ascertained, but which exceeds $75,000.

## COUNT VII

## SPECIFIC PERFORMANCE

(Against Franchisee Defendants and Schmidt)

174. Plaintiffs incorporate and re-allege each and every one of the allegations set forth in paragraphs 1 through 173 above as though fully set forth herein.

175. RGN is entitled to specific performance of the Franchisee Defendants' obligations under the Franchise Agreements, including the requirements that the Franchisee Defendants comply with the Franchise Agreements' post-termination obligations to discontinue the use of all Regus Marks and trade dress, and post-termination non-competition covenants.

176. RGN is entitled to specific performance of Schmidt's obligations under the Guarantees, including the obligation to ensure the Franchisee Defendants' compliance with their post-termination obligations to discontinue the use of all Regus Marks and trade dress, and post-termination non-competition covenants.

42

177.  RGN is entitled to specific performance of Schmidt's obligations under the Non-Compete Agreements, including his post-termination non-competition covenants.

178.  RGN will be irreparably harmed if the Franchisee Defendants and Schmidt are not required to specifically perform under the Franchise Agreements, Guarantees and Non-Compete Agreements, respectively.

179.  RGN is further entitled to injunctive relief with respect to enforcement with compliance with the post-termination non-competition covenants in the Franchise Agreements and Non-Compete Agreements.

## **PRAYER FOR RELEIF**

**WHEREFORE**, Plaintiffs RGN-USF, LLC and Pathway IP II GmbH pray:

1.      For an Order declaring the Multi-Site Agreement and Franchise Agreements terminated and that the Defendants and their agents and employees be required to immediately comply with the post-termination obligations in the Franchise Agreements and Non-Compete Agreements.

2.      Pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), that the Defendants, their affiliates, subsidiaries, officers, agents, servants, employees and attorneys, and all those who act in concert or participation with them, be preliminarily and permanently enjoined and restrained from:

(a)      marketing, promoting or renting office space or related

services at 101 N. Old Woodward Ave., Birmingham, Michigan; 29777 Telegraph Road, Southfield, Michigan 48034; 22600 Hall Road, Suite 100, Clinton Township, Michigan 48036-1172; and 2006 Hogback Road, Suite 100, Ann Arbor, Michigan 48105, such that the origin of the Defendants' goods or services are falsely designated as being associated with the Regus Marks or Regus® brand, or designated in a manner that is confusingly similar to the Regus Marks or Regus® brand; and

(b)    using any and all print or telecommunications advertisements, drafts, labels, signs, flyers, stationery, envelopes, applications, booklets, brochures, catalogues, circulars, pamphlets, periodicals, bulletins, instructions, minutes, other communications, purchase orders, contracts, agreements, options to purchase, deeds, memoranda of agreements, assignments, licenses, books of account, orders, accounts, working papers, plans, internet sites, domain names and/or e-mail and e-mail addresses that display, in any manner, the Regus trade names and service marks, any derivation of the Regus trade names and service marks, or names and marks confusingly similar to the Regus trade names and service marks;

(c)    violating the Franchisee Defendants' post-termination obligations set forth in the Franchise Agreements Agreement; and

(d)    violating Schmidt's post-termination obligations set forth in

the Non-Compete Agreements.

3. That PIPS recover from the Defendants, statutory, actual and compensatory damages in an amount to be determined;

4. For disgorgement of profits to PIPS pursuant to 15 U.S.C. § 1117;

5. For punitive damages awarded to PIPS for the Defendants' willful and intentional conduct;

6. For treble damages pursuant to 15 U.S.C. Section 1117(b);

7. For a judgment in favor of RGN and against Megatron, on RGN's claim for breach of the Multi-Site Development Agreement (Count II) in an amount to be determined at trial;

8. For a judgment in favor of RGN and against Birmingham Franchisee, on RGN's claim for breach of the Birmingham Franchise Agreement (Count III) in an amount to be determined at trial;

9. For a judgment in favor of RGN and against Southfield Franchisee, on RGN's claim for breach of the Southfield Franchise Agreement (Count IV) in an amount to be determined at trial;

10. For a judgment in favor of RGN and against Clinton Township Franchisee, on RGN's claim for breach of the Clinton Township Franchise Agreement (Count V) in an amount to be determined at trial;

11. For a judgment in favor of RGN and against Ann Arbor Franchisee,

on RGN's claim for breach of the Ann Arbor Franchise Agreement (Count VI) in an amount to be determined at trial;

12.    For a judgment in favor of RGN and against Schmidt, on RGN's claim for breach of the Guarantees (Count VII) in an amount to be determined at trial;

13.    For a judgment in favor of RGN and against Schmidt, on RGN's claim for breach of the Non-Compete Agreements (Count VIII) in an amount to be determined at trial;

14.    For a judgment in favor of Plaintiffs and against Defendants for Plaintiffs' reasonable attorneys' fees and litigation expenses; and

15.    That Plaintiffs be granted such other and further relief as the Court shall deem just and proper.


Dated:  April 3, 2025                    Respectfully submitted,

                                         By:    /s/Amy M. Johnston
                                                Amy M. Johnston (P51272)
                                                Miller, Canfield, Paddock and Stone, PLC
                                                150 West Jefferson, Ste. 2500
                                                Detroit, MI 48226
                                                (313) 963-6420
                                                johnston@millercanfield.com

                                                and

Keith D. Klein 184846
Robert A. Chereck 234693
(*Admission Requests Forthcoming*)
Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA  90401-2386
(310) 576-2159
keith.klein@bclplaw.com
andrew.chereck@bclplaw.com

Attorneys for Plaintiffs RGN-USF, LLC
and Pathway IP II GmbH

43550474.1/163120.00001